# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

P&A Marketing and Allegheny
Point Insurance,

                Petitioners

            v.

Workers' Compensation Appeal
Board (Spencer),

                Respondent

:
:
:
:
:
:   No. 1588 C.D. 2018
:   Submitted: March 22, 2019
:
:
:
:
:

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**         **FILED: August 12, 2019**

      P&A Marketing and Allegheny Point Insurance (collectively, Employer) petition for review of an order of the Workers' Compensation Appeal Board (Board), dated November 14, 2018. The Board modified, in part, and affirmed, in part, the decision of a Workers' Compensation Judge (WCJ), denying Employer's modification petition and granting, in part, the reinstatement petition filed by Evelyn Spencer (Claimant).[1] For the reasons set forth below, we affirm the Board's order.

---

[1] The WCJ also denied Claimant's penalty petition. Claimant's penalty petition is not relevant to this appeal, and, therefore, we do not address it in this opinion.

On May 24, 2014, Claimant sustained a work-related injury in the nature of a right shoulder rotator cuff tear, while working for Employer. Employer accepted liability for Claimant's work-related injury pursuant to a Notice of Compensation Payable (NCP). Thereafter, on October 3, 2016, Employer filed a modification petition, seeking a suspension of Claimant's workers' compensation benefits.[2] On that same date, Employer issued a Notice of Suspension, advising Claimant that Employer had suspended Claimant's workers' compensation benefits as of September 18, 2016, due to her failure to return Form LIBC-760, Employee Verification of Employment, Self-Employment or Change in Physical Condition. Subsequently, on November 30, 2016, Claimant filed a reinstatement petition, seeking to have her workers' compensation benefits reinstated subsequent to her completion and return of Form LIBC-760 to Employer.

Before the WCJ, Claimant testified that she has been the owner of Chadds Ford Travel since 1990. (Reproduced Record (R.R.) at 154-55.) Approximately 20 years ago, there were some changes in the travel agency business, which caused Claimant to switch from a storefront operation to a home-based operation by appointment only. (*Id.* at 155-56.) In 2008, however, the economy declined, and Claimant had to look for additional work to help pay her bills. (*Id.* at 156.) As a result, in December 2009, Claimant began working for Employer

---

[2] Employer's modification petition indicates that Employer is requesting a suspension of Claimant's benefits effective September *26*, 2016. Based on our review of the record and the parties' briefs, however, it appears that this date is a typographical error and that the correct date should be September *16*, 2016, the date on which Employer offered Claimant the full-time receptionist position. In addition, in its first hearing filing submitted to the WCJ, Employer amended its modification petition, seeking a suspension of Claimant's workers' compensation benefits effective February 14, 2016, the date on which Claimant returned to her preinjury position in a modified-duty capacity and allegedly refused to accept caregiver/companion job assignments that were within her restrictions.

2

as a caretaker/companion for elderly individuals. (*Id.* at 156-58, 160-61.) On both her employment application and during her interview, Claimant made Employer aware of her travel agency business. (*Id.* at 185-87.) Throughout her employment with Employer, Claimant continued to operate her travel agency business on a full-time basis by appointment and scheduled her travel agency appointments around her caretaker/companion job assignments. (*Id.* at 156-58, 165.)

Claimant also testified that on May 24, 2014, she was pulling up an elderly individual in bed when she heard a pop and immediately experienced pain in her right shoulder. (*Id.* at 166-67.) Claimant sought treatment for her injury, but she continued to work for Employer in a limited capacity—*i.e.*, she took less caretaker/companion job assignments than she would have liked—due to her pain and medications. (*Id.* at 168-69.) Eventually, Claimant came under the care of Michael Pushkarewicz, M.D., who performed surgery on Claimant's right shoulder on April 8, 2015. (*Id.* at 168-70.) Following the surgery, Claimant was out of work for approximately 4 months, but Dr. Pushkarewicz subsequently released Claimant to return to work under restrictions of no raising her right arm above her head, no lifting with her right arm, and no driving for longer than 15 minutes. (*Id.* at 170-72.)

Claimant explained that, upon her return to work for Employer, she was very careful to ensure that the tasks she would be required to perform for any new clients were within her work restrictions. (*Id.* at 172.) Claimant indicated that she had to reject certain caregiver/companion job assignments due to her right shoulder symptoms and her work restrictions, including the driving restriction. (*Id.* at 172-73.) Claimant explained that she had difficulty driving because she could not move her right arm with the steering wheel in a clockwise or counterclockwise direction, and she experienced a jabbing, throbbing pain in her right shoulder after

3

driving for any length of time. (*Id.* at 173-74.) Claimant indicated that she also rejected caregiver/companion job assignments if the client was a male, but that she had previously advised Employer that she would not be comfortable providing caretaker/companion services to male individuals. (*Id.* at 162-64, 178-79, 203, 219.) Claimant admitted that she also might have declined other caregiver/companion job assignments offered to her by Employer because the assignments started before 10:00 a.m., she was singing in church on a Sunday, or she would be away from home. (*Id.* at 218-22.) When asked whether she could recall declining a caregiver/companion job assignment involving a recurring schedule from 10 a.m. to 5 p.m., Claimant indicated that Dr. Pushkarewicz had placed time limitations on her ability to work of not more than 4 hours at a time. (*Id.* at 222.) Claimant stated further that, prior to the May 24, 2014 work-related injury, she often worked 3 to 4 hours on weekday evenings or 9 a.m. to 5 p.m. on the weekends. (*Id.* at 234-35.) She explained, however, that after the May 24, 2014 work-related injury, she could no longer work evenings and weekends because the caregiver/companion job assignments were often located in clients' homes, where she would not have had any assistance, and she did not believe that she was capable of providing the necessary care. (*Id.* at 235, 237-38.) Claimant further indicated that she did not have any problems with her right shoulder prior to the May 24, 2014 work-related injury. (*Id.* at 232.)

Claimant testified that she has not worked for Employer since September 2016. (*Id.* at 187-88.) She indicated that, in the beginning of September 2016, Employer stopped offering her caregiver/companion job assignments. (*Id.* at 177-78.) By letter dated September 16, 2016, Employer offered Claimant a full-time receptionist position, Monday through Friday, 8:30 a.m.

4

to 5 p.m., at Employer's main office located in West Chester, Pennsylvania. (*Id.* at 180-81.) Claimant explained that the drive from her home to Employer's main office would have taken her approximately 1 hour in traffic. (*Id.* at 181-84.) Claimant explained further that she did not follow up with Employer on the job offer or attempt to perform the full-time receptionist position because: (1) she continued to experience problems with driving and remained under Dr. Pushkarewicz's driving restrictions, which she believed to be driving not more than 1 half hour at a time; and (2) with a full-time schedule and the drive home from Employer's main office, she would not have had any time to devote to her travel agency business, which was a full-time job. (*Id.* at 180-85, 230-31.)

Claimant testified further that, following her April 8, 2015 surgery, she continued to treat with Dr. Pushkarewicz on a regular basis—*i.e.*, every 3 to 4 weeks. (*Id.* at 190-91.) During that time, Claimant underwent a course of physical therapy, but her symptoms never really improved. (*Id.* at 207-08.) Claimant explained that she eventually stopped treating with Dr. Pushkarewicz in April 2017, because Dr. Pushkarewicz had informed her that there was nothing more that he could do for her and that she was "as good as [she was] going to get." (*Id.* at 190, 192.) Claimant indicated, however, that she did not feel like her right shoulder condition had resolved following the April 8, 2015 surgery, that she believed that she should have been further along in her recovery, and that she continued to experience pain and discomfort in her right shoulder, as well as limitations with certain activities. (*Id.* at 189-94.) As a result, in June 2017, Claimant began treating with Adrienne J. Towsen, M.D., who performed a shoulder replacement surgery on Claimant's right shoulder on August 11, 2017. (*Id.* at 194-96.) As of the time of the September 6, 2017 hearing before the WCJ,

5

Dr. Towsen had not yet released Claimant to return to work in any capacity. (*Id.* at 196.)

Claimant also presented the deposition testimony of Dr. Towsen, who is board certified in orthopedic surgery and concentrates her practice on the treatment of knees and shoulders. (*Id.* at 273, 275.) Dr. Towsen first treated Claimant on June 5, 2017, for complaints of persistent right shoulder pain and weakness relative to Claimant's May 24, 2014 work-related injury. (*Id.* at 279-80.) At that time, Claimant did not report that she had any problems with her right shoulder or with performing her job as a caregiver/companion prior to May 24, 2014. (*Id.* at 280.) Claimant also did not report that she had any additional injuries to her right shoulder between May 24, 2014, and June 5, 2017. (*Id.*) Dr. Towsen performed a physical examination of Claimant's right shoulder, which revealed significant deficits in active range of motion and strength, pain with both active and passive range of motion, and pain with rotator cuff testing. (*Id.* at 282-83.) Dr. Towsen also reviewed a September 9, 2014 MRI report of Claimant's right shoulder, which revealed a full thickness tear in the supraspinatus tendon, degenerative changes in the acromioclavicular joint, and degeneration of the biceps tendon, but no indication of arthritic change in the glenohumeral joint. (*Id.* at 290-92.) Dr. Towsen explained that, in light of the MRI results and Claimant's history, the rotator cuff tear in Claimant's right shoulder was more acute than chronic in nature and was a reasonable result of Claimant's May 24, 2014 work-related incident. (*Id.* at 292.) Based on her evaluation of Claimant, Dr. Towsen ultimately diagnosed Claimant with a right shoulder rotator cuff tear/deficiency following a failed rotator cuff repair surgery. (*Id.* at 283-84, 286.) While she was unsure whether she placed Claimant under any formal work

6

restrictions, Dr. Towsen noted that Claimant was not capable of performing any type of lifting, repetitive movements, or activity at shoulder height or above with her right arm. (*Id.* at 284.)

With respect to Claimant's treatment history, Dr. Towsen testified that Dr. Pushkarewicz performed an arthroscopic rotator cuff repair on Claimant's right shoulder on April 8, 2015. (*Id.* at 293.) Dr. Towsen indicated that Dr. Pushkarewicz noted a large, mobile tear in his operative report, which suggested that the tear was more acute in nature. (*Id.* at 293-94.) Dr. Towsen explained that, following the surgery, Claimant consistently treated with Dr. Pushkarewicz and underwent a standard rotator cuff rehabilitation protocol, which included physical therapy and other nonsurgical options, but that Claimant continued to experience pain and did not gain any strength or range of motion. (*Id.* at 286-90.) Dr. Towsen stated that she did not see any indication that Claimant had ever fully recovered from her right shoulder rotator cuff repair subsequent to the April 8, 2015 surgery. (*Id.* at 294.) Dr. Towsen also believed that Dr. Pushkarewicz placed Claimant under permanent restrictions of lifting not more than 20 pounds occasionally and not more than 10 pounds frequently. (*Id.* at 300-01.) When asked whether Claimant would have any problems with driving given the condition of her right shoulder, Dr. Towsen stated that Claimant would likely have problems, particularly with turning, because any movement that would bring Claimant's right arm to shoulder height would be difficult and, therefore, Claimant would have to rely on her other arm for steering and turning. (*Id.* at 302-03.)

Dr. Towsen also testified that, at the time of her initial evaluation of Claimant on June 5, 2017, she ordered an MRI of Claimant's right shoulder so that she could better advise Claimant of her potential treatment options. (*Id.* at 286,

7

297-98.)  The MRI revealed a very large and retracted tear of the rotator cuff, arthritic changes in the glenohumeral joint, and an abscess of the biceps tendon. (*Id.* at 298-99.)  Based on the results of the MRI, Dr. Towsen believed that the best surgical option and most complete surgical fix that would give Claimant the greatest possible shoulder function and control Claimant's pain was a reverse shoulder arthroplasty.  (*Id.* at 299-300.)  Dr. Towsen performed the reverse shoulder replacement surgery on Claimant's right shoulder on August 11, 2017.  (*Id.* at 304.)  During the surgery, Dr. Towsen discovered, *inter alia*, that Claimant's rotator cuff repair had completely failed and that the tendon had fully torn away from the bone. (*Id.* at 304-05.)  Dr. Towsen indicated that Claimant was doing reasonably well postoperatively, but that the typical recovery period following this type of surgery is 9 to 12 months.  (*Id.* at 305-06.)  At the time of her August 31, 2017 deposition, Dr. Towsen continued to treat Claimant on a regular basis and had not yet released Claimant to return to work in any capacity.  (*Id.* at 306-07.)

Overall, Dr. Towsen opined within a reasonable degree of medical certainty that Claimant's current problems with her right shoulder and all of the care that Claimant had received for her right shoulder since the time of the May 24, 2014 work-related incident, including the surgery that Dr. Towsen performed on August 11, 2017, directly related to Claimant's work-related right shoulder rotator cuff tear.  (*Id.* at 307-09, 313-14.)  Dr. Towsen further opined that, based on Claimant's persistent pain with active motion and limited strength and the fact that the subsequent MRI and surgery confirmed that Claimant's rotator cuff had re-torn or never fully healed, Claimant did not have a favorable result following the April 8, 2015 surgery.  (*Id.* at 308-09.)  Dr. Towsen also opined that Claimant had

8

not yet fully recovered from the May 24, 2014 work-related right shoulder rotator cuff tear. (*Id.* at 310.)

Dr. Towsen admitted that an intervening trauma is not necessary for there to be a re-tear of the rotator cuff. (*Id.* at 315.) Dr. Towsen further admitted that her opinions in this matter could possibly change if someone provided her with information about a preexisting condition involving Claimant's right shoulder. (*Id.* at 315-17.) Dr. Towsen denied having any knowledge of Claimant's complaint to her primary care physician of right shoulder pain after shoveling snow on December 22, 2009, but indicated that this fact did not change her opinions in this matter. (*Id.* at 317, 342.) Dr. Towsen further indicated that a person can experience shoulder soreness without having a rotator cuff tear and that the typical symptoms for a rotator cuff tear are loss of active motion, weakness, and constant pain. (*Id.* at 322.) Dr. Towsen also admitted that some patients present to her with rotator cuff tears resulting from overuse injuries or age-related changes but denied that there is a higher incidence of rotator cuff tears among individuals of Claimant's age versus the remainder of the general population. (*Id.* at 322-23.) Dr. Towsen explained:

> There is no question that some rotator cuff pathology and some arthritic change in joints -- in the shoulder joint, specifically, is related to age and degeneration. And some people have surgery because of that. Other people have surgery because of trauma. And just because you're 70 years old, doesn't mean you can't have trauma to your shoulder that causes problems that this woman has had otherwise.

(*Id.* at 339.) Dr. Towsen further conceded that there was no evidence in the operative report that Dr. Pushkarewicz did not properly anchor the tendons or perform the rotator cuff repair. (*Id.* at 323-24.) When asked how she could have then concluded that Dr. Pushkarewicz's rotator cuff repair surgery failed without ever discussing the

9

procedure with him directly, Dr. Towsen explained that she was not being accusatory toward Dr. Pushkarewicz but sometimes rotator cuff repairs just fail and, in this situation, Claimant had a repair and now has a tear. (*Id.* at 340.) Dr. Towsen admitted, however, that her opinion regarding the failed rotator cuff repair surgery assumes that Claimant did not suffer any intervening trauma. (*Id.*)

Employer presented the deposition testimony of David Rubenstein, M.D., who is board certified in orthopedic surgery and specializes in the treatment of knee and shoulder injuries. (*Id.* at 21.) Dr. Rubenstein performed an independent medical examination of Claimant on April 19, 2016, which included reviewing Claimant's medical records, obtaining a history, and performing a physical examination. (*Id.* at 25-32.) Based on his evaluation of Claimant, Dr. Rubenstein opined that Claimant had sustained a work-related right shoulder rotator cuff tear on May 24, 2014. (*Id.* at 32-33.) Dr. Rubenstein explained that, at the time of his examination, which was a little over 1 year after she had undergone surgery, Claimant had a good functional result with some deficits in her right shoulder, including pain associated with rotator cuff strength testing, weakness, and decreased range of motion, particularly in internal rotation. (*Id.* at 33-34.) Dr. Rubenstein further opined that Claimant had reached maximum medical improvement and did not require any further medical treatment. (*Id.* at 34, 36.) Dr. Rubenstein also opined that Claimant was capable of returning to work in a light-duty capacity with restrictions of driving up to 3 hours per day, but not more than 1 hour at a time, occasional reaching under 90 degrees of elevation with the right arm, occasional lifting up to 20 pounds, frequent lifting and carrying up to 10 pounds, and pushing and pulling under 90 degrees elevation. (*Id.* at 34-35, 39-40.)

Employer also presented the deposition testimony of Stephanie Dolan, Employer's project manager, who is responsible for handling all of Employer's workers' compensation claims. (*Id.* at 92-93.) Ms. Dolan testified that, on February 14, 2016, Claimant returned to work as a caregiver in a modified-duty capacity with restrictions of no lifting more than 20 pounds. (*Id.* at 94, 96.) Following her return to work on February 14, 2016, Employer offered Claimant caregiver/companion job assignments that were within her restrictions when such assignments were available. (*Id.* at 95-96.) Ms. Dolan explained that, between February 16, 2016, and September 16, 2016, Claimant accepted some of the caregiver/companion job assignments offered to her by Employer but declined or did not respond to others. (*Id.* at 99-104.) Ms. Dolan further explained that none of Claimant's responses declining the caregiver/companion job assignments were premised on Claimant's inability to perform the assignments due to her work-related injury. (*Id.* at 118.) Since September 16, 2016, Employer has not offered Claimant any additional caregiver/companion job assignments even though Employer has had caregiver/companion job assignments available that have been within Claimant's restrictions. (*Id.* at 116-17.) Ms. Dolan indicated that, on September 16, 2016, Employer offered Claimant a full-time receptionist position, Monday through Friday, 8:30 a.m. through 5 p.m., but that Claimant did not accept and never responded to Employer about such position. (*Id.* at 105-08.) Ms. Dolan admitted that she did not believe that Claimant was under a driving restriction and that Employer did not consider any such driving restriction when it offered the caregiver/companion job assignments or the full-time receptionist position to Claimant. (*Id.* at 115-16.)

11

On December 15, 2017, the WCJ issued a decision, denying Employer's modification petition and granting, in part, Claimant's reinstatement petition. In so doing, the WCJ summarized the witnesses' testimony and made the following relevant findings of fact and credibility determinations:

10. I have carefully reviewed Claimant's testimony and make the credibility determinations, based in part on my personal observation of Claimant's demeanor during testimony:

a. I find Claimant's testimony to be credible regarding her injury, treatment, and continuing work-related disability. Claimant's testimony in this regard is consistent with her medical treatment, and corroborated by objective medical evidence establishing a rotator cuff tear.

b. I find Claimant's testimony to be credible to the extent that it supports a finding that she was partially disabled from performing her pre-injury job for Employer because of her work-related lifting and driving restrictions. Claimant's testimony is credible in this regard because she continued to accept job assignments that were within her restrictions. Although Ms. Dolan identified certain job assignments that Claimant rejected without reference to her work injury, she agreed that Claimant could have given her reasons by phone, and further agreed that she did not consider Claimant's driving restrictions in making job assignments.

c. I find Claimant's testimony to be credible to the extent that it supports a finding that she could not perform the full-time receptionist position offered to her in September, 2016. I accept Claimant's testimony that the position required an hour or longer driving and was thus beyond her

12

medical restrictions. I also accept Claimant's testimony that she could not accept a full-time position because it would conflict with her full-time travel agent job, which she had continued since the date of the work injury.

. . . .

11. I have carefully reviewed the testimony of [Ms.] Dolan and find it to be credible regarding Employer's communications with Claimant about available jobs, and Claimant's refusal to accept the receptionist position offered to her. However, to the extent that Ms. Dolan's testimony conflicts with Claimant's testimony accepted as credible above, Ms. Dolan's testimony is rejected as less credible.

12. I have carefully reviewed the medical evidence presented in this matter and find that the testimony of Dr. Towsen is more credible than the testimony of Dr. Rubenstein. Dr. Towsen's testimony is corroborated by MRI studies which established a rotator cuff tear. Dr. Towsen's testimony that the original shoulder surgery had failed, and that the August 11, 2017 surgery was work-related, is credible given that Claimant never recovered from her first surgery and had no history of intervening injuries. Dr. Towsen's testimony regarding the 2017 MRI and surgery was unrebutted. Dr. Rubenstein's testimony is not credible, given that he acknowledged Claimant's ongoing disability yet opined that Claimant did not need further treatment. In addition, Dr. Rubenstein examined Claimant on April 19, 2016[,] and did not review the June 14, 2017 MRI or the August 11, 2017 surgery [report].

13. Regarding Claimant's ability to return to work, I find that Claimant continues to have limited use of her right arm, a 20-pound lifting restriction and a driving restriction of no more than one hour at a time. This finding is based upon the testimony of Dr. Towsen and Dr. Rubenstein, who agreed that Claimant continues to have work restrictions. I find that Claimant worked within her restrictions until September 16, 2016, at which time

13

> Employer no longer offered Claimant employment within her restrictions.

(WCJ's Decision at 10-11.)

Based on these findings of fact and credibility determinations, the WCJ concluded that Employer failed to meet its burden of proving that Employer offered Claimant available work that was within her physical capacity. The WCJ also concluded that Claimant met her burden of proving that she was totally disabled as a result of her May 24, 2014 work-related injury beginning on September 16, 2016, the date on which Employer no longer offered Claimant available employment that was within her work restrictions. Ultimately, the WCJ: (1) awarded Claimant partial disability benefits from February 1, 2016, to September 15, 2016, based upon Claimant's earnings during that time period; (2) awarded Claimant total disability benefits from September 16, 2016, to October 2, 2016; (3) suspended Claimant's total disability benefits from October 3, 2016, to November 8, 2016; and (4) awarded Claimant total disability benefits from November 9, 2016, "through the *present*."[3] (WCJ's Decision at 12 (emphasis added).) Employer and Claimant cross-appealed to the Board, which modified the WCJ's order to "award [Claimant] indemnity benefits for total disability from November 9, 2016 and *ongoing*" thereafter and affirmed the WCJ's decision in all other respects. (Board's Order dated Nov. 14, 2018 (emphasis added).) Employer then petitioned this Court for review.

---

[3] While it is not entirely clear to this Court why the WCJ suspended Claimant's workers' compensation benefits from October 3, 2016, to November 8, 2016, it appears that it may have been related to Claimant's receipt of age-related social security benefits and the credit to which Employer was entitled as a result of Claimant's receipt of such benefits.

On appeal,[4] Employer argues: (1) the Board and the WCJ erred by failing to suspend Claimant's workers' compensation benefits, because Claimant returned to her time of injury job on February 14, 2016, and thereafter refused to accept available caretaker/companion job assignments and a full-time receptionist position offered to her by Employer in bad faith for reasons that were unrelated to her work-related injury; (2) the WCJ committed an error of law by reinstating Claimant's total disability benefits as of November 9, 2016, because, in doing so, the WCJ impermissibly expanded the description of Claimant's work-related injury to include a consequential condition,[5] when Claimant did not file a review petition seeking to amend the description of her injury set forth in the NCP and there was no material mistake made at the time Employer issued the NCP; and (3) the Board committed an error of law by substituting its own judgment for that of the WCJ and modifying the WCJ's order to award Claimant indemnity benefits for total disability from November 9, 2016 and ongoing thereafter.

First, we address Employer's argument that the Board and the WCJ erred by failing to suspend Claimant's workers' compensation benefits, because Claimant returned to her time of injury job on February 14, 2016, and thereafter, in bad faith and for reasons that were unrelated to her work-related injury, refused to accept available caretaker/companion job assignments and a full-time receptionist

---

[4] This Court's standard of review is limited to determining whether constitutional rights were violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

[5] A "consequential condition" is "one that is a natural consequence of the original injury." *Carlow Univ. v. Workers' Comp. Appeal Bd. (Wunschel)* (Pa. Cmwlth., No. 1814 C.D. 2012, filed July 12, 2013), slip op. at 6. Pursuant to Commonwealth Court Internal Operating Procedure § 414(a), "an unreported panel decision of this [C]ourt issued after January 15, 2008, [may be cited] for its persuasive value, but not as binding precedent." 210 Pa. Code § 69.414(a).

15

position offered to her by Employer. The gist of Employer's argument appears to be that there is not substantial evidence of record to support the WCJ's finding that the caregiver/companion job assignments and the full-time receptionist position were not within Claimant's work restrictions, and, therefore, the WCJ should have continued his analysis and considered whether Claimant followed through on the offered caretaker/companion job assignments and the full-time receptionist position in bad faith. More specifically, Employer argues that Dr. Pushkarewicz did not place Claimant under a driving restriction that prevented Claimant from performing the offered caretaker/companion job assignments or the full-time receptionist position. Employer also argues that Claimant's refusal to accept the offered caretaker/companion job assignments and the full-time receptionist position had nothing to do with Claimant's work-related injury, but rather, related to her personal choices, including that the caretaker/companion job assignments and full-time receptionist position conflicted with her travel agency schedule. In response, Claimant argues that the Board properly affirmed the WCJ's decision to not suspend Claimant's workers' compensation benefits because the substantial, credible evidence of record establishes that the caregiver/companion job assignments and the full-time receptionist position were not within Claimant's work restrictions due to the required driving distance, and, therefore, the burden never shifted to Claimant to demonstrate that she followed through on the caretaker/companion job assignments and full-time receptionist position in good faith.

In workers' compensation proceedings, the WCJ is the ultimate finder of fact. *Williams v. Workers' Comp. Appeal Bd.* (*USX Corp.-Fairless Works*), 862 A.2d 137, 143 (Pa. Cmwlth. 2004). As fact-finder, matters of credibility, conflicting medical evidence, and evidentiary weight are within the WCJ's exclusive

16

province. *Id.* If the WCJ's findings are supported by substantial evidence, they are binding on appeal. *Agresta v. Workers' Comp. Appeal Bd.* (*Borough of Mechanicsburg*), 850 A.2d 890, 893 (Pa. Cmwlth. 2004). Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a finding. *Mrs. Smith's Frozen Foods Co. v. Workmen's Comp. Appeal Bd. (Clouser)*, 539 A.2d 11, 14 (Pa. Cmwlth. 1988). "In performing a substantial evidence analysis, this [C]ourt must view the evidence in a light most favorable to the party [that] prevailed before the fact[-]finder." *Hoffmaster v. Workers' Comp. Appeal Bd.* (*Senco Prods., Inc.*), 721 A.2d 1152, 1155 (Pa. Cmwlth. 1998). "Moreover, we are to draw all reasonable inferences which are deducible from the evidence in support of the fact[-]finder's decision in favor of that prevailing party." *Id.*

An employer seeking a suspension or modification of benefits on the basis that the claimant has recovered some or all of his ability to work, must produce: (1) credible medical evidence establishing that the claimant's physical condition has changed; and (2) evidence that the employer referred the claimant to a then-available job that the claimant is capable of performing based on his medical clearance. *Kachinski v. Workmen's Comp. Appeal Bd. (Vepco Constr. Co.)*, 532 A.2d 374, 380 (Pa. 1987). The burden then shifts to the claimant to demonstrate that he followed through on the job referral in good faith. *Id.* In the event that the referral does not result in a job, the claimant's benefits should continue. *Id.*

Here, the WCJ's finding that the caregiver/companion job assignments and the full-time receptionist position were not within Claimant's work restrictions is supported by substantial evidence. Claimant credibly testified that Dr. Pushkarewicz placed her under a driving restriction and that, as a result of such driving restriction, she had to reject certain caregiver/companion job assignments.

17

Claimant also credibly testified that she did not follow-up with Employer regarding the full-time receptionist position or attempt to perform such position because the drive from her home to Employer's main office would take her approximately 1 hour in traffic and would exceed Dr. Pushkarewicz's driving restriction. In addition, while she was not yet treating Claimant at the time that Claimant rejected the caregiver/companion job assignments and the full-time receptionist position, Dr. Towsen noted that Claimant would likely have had problems driving because any movement, including turning, that would bring Claimant's right arm to shoulder height would have been difficult for Claimant given the condition of her right shoulder. We must also note that, even though the WCJ did not find Dr. Rubenstein's testimony to be credible, the WCJ recognized that Dr. Rubenstein had agreed that Claimant continued to be subject to work restrictions, which included driving up to 3 hours per day, but not more than 1 hour at a time.[6]

---

[6] While Employer does not specifically argue that the WCJ should not have considered Claimant's commute from her residence to Employer's office in determining whether the offered full-time receptionist position was available to Claimant—*i.e.*, within Claimant's physical restrictions—we note that a claimant's inability to commute to and from an offered position can support a finding that an offered position is not available to a claimant. *See, e.g.*, *Roadway Express, Inc. v. Workmen's Comp. Appeal Bd. (Palmer)*, 659 A.2d 12, 18-19 (Pa. Cmwlth.), *appeal denied*, 670 A.2d 145 (Pa. 1995) (concluding there was substantial evidence of record to support finding that offered dispatcher job located 120 miles from claimant's place of residence was not actually available to claimant because employer's expert testified claimant could not perform dispatcher position if claimant was also commuting 120 miles to work each day due to the psychological overlay of his injuries); *Topps Mkt. 601 v. Workers' Comp. Appeal Bd. (VanGorder)* (Pa. Cmwlth., No. 2276 C.D. 2009, filed March 16, 2010) (concluding WCJ did not err by concluding employer failed to establish offered position was actually available to claimant when claimant was no longer physically capable of commuting from his residence to employer's store but was capable of performing modified duty position at store); *Smith v. Workers' Comp. Appeal Bd. (Franco Constr.)* (Pa. Cmwlth., No. 1108 C.D. 2007, filed Jan. 16, 2008) (remanding matter to Board with instructions to remand to WCJ to address whether impact of claimant's bus commute on claimant's work-related injuries would have impact on availability of offered position).

Furthermore, although not the specific focus of the parties' arguments before this Court, the WCJ noted that Claimant was subject to a lifting restriction and continued to accept caregiver/companion job assignments within that restriction. Given that there is substantial evidence of record to establish that the caregiver/companion job assignments and the full-time receptionist position were not within Claimant's work restrictions (driving and/or lifting), Employer could not have met its burden of proof and, therefore, the burden never shifted to Claimant to establish that she followed through on the offered caretaker/companion job assignments and full-time receptionist position in good faith. The WCJ was not required to consider whether Claimant failed to follow-up on the offered caretaker/companion job assignments and full-time receptionist position in bad faith for reasons unrelated to her May 24, 2014 work-related injury because the burden never shifted to Claimant. For these reasons, we cannot conclude that the Board and the WCJ erred by failing to suspend Claimant's workers' compensation benefits.

Next, we address Employer's argument that the WCJ committed an error of law by reinstating Claimant's total disability benefits as of November 9, 2016, because, in doing so, the WCJ impermissibly expanded the description of Claimant's work-related injury to include a consequential condition, when Claimant did not file a review petition seeking to amend the description of her injury set forth in the NCP and there was no material mistake made at the time that Employer issued the NCP. More specifically, Employer argues that the condition that necessitated Claimant's need to undergo the right shoulder replacement surgery was separate and distinct from the May 24, 2014 work-related right rotator cuff tear and/or was a condition that developed over time and that did not exist at the time that Employer issued the NCP. Employer, therefore, contends that the WCJ could

19

not simply amend Claimant's injury description as a means to reinstate Claimant's total disability benefits because no material mistake in the description of Claimant's work-related injury existed at the time that Employer issued the NCP. Employer further argues that, even if the NCP contained a material mistake and the WCJ was permitted to amend Claimant's injury description, the medical evidence upon which the WCJ relied to establish a causal relationship between the accepted right shoulder rotator cuff tear and the shoulder replacement surgery was not competent to support an award of benefits.[7]

In making these arguments, Employer appears to ignore the fact that the WCJ did not amend Claimant's injury description nor was the WCJ required to amend Claimant's injury description before reinstating Claimant's benefits, because the reverse shoulder replacement surgery was performed to treat Claimant's May 24, 2014 work-related right shoulder rotator cuff tear and not some new or consequential condition. Despite Employer's contention that the condition that necessitated Claimant's need to undergo the reverse shoulder replacement surgery was separate and distinct from the May 24, 2014 work-related right rotator cuff tear,

---

[7] Claimant has not presented any substantive response in opposition to Employer's argument that the WCJ committed an error of law by reinstating Claimant's total disability benefits as of November 9, 2016, in connection with a consequential condition relating to her May 24, 2014 work-related right shoulder rotator cuff tear. Rather, Claimant argues that Employer waived this issue by failing to raise it before the Board. In response, Employer contends that it properly preserved this issue in its briefs to both the WCJ and the Board. We have reviewed Employer's briefs to both the WCJ and the Board and must conclude that Employer adequately preserved this issue for purposes of this appeal. In both of Employer's briefs, Employer referenced Claimant's failure to file a petition to review seeking to amend the description of her work-related injury to include the alleged condition that resulted in Claimant's need to undergo a right shoulder replacement. (*See* Supplemental Reproduced Record at 22, 37.) While Employer may not have used the language "consequential condition," Employer's references to Claimant's failure to file a petition to review seeking to amend the description of her injury are sufficient to preserve Employer's issue on appeal.

20

Employer has not directed our attention to any medical testimony or other evidence that would tend to establish this contention as fact. In fact, the evidence of record establishes that the reverse shoulder replacement surgery was simply an additional surgery that Dr. Towsen performed to repair the May 24, 2014 work-related right shoulder rotator cuff tear because Dr. Pushkarewicz's April 8, 2015 rotator cuff repair surgery had failed. As discussed above, Dr. Towsen opined that the rotator cuff repair surgery performed by Dr. Pushkarewicz on April 8, 2015, had failed and had resulted in a rotator cuff deficiency in Claimant's right shoulder. Dr. Towsen further opined that Claimant continued to suffer from her May 24, 2004 work-related rotator cuff injury and that all of the care that Claimant had received for her right shoulder since that date, including the reverse shoulder replacement surgery, was directly related to that original injury.

Employer is essentially asking this Court to speculate, based on Dr. Rubenstein's opinion that Claimant had a good functional result, had reached maximum medical improvement, and required no further treatment as of the date of his independent medical examination, that Claimant's need for the reverse shoulder replacement surgery was separate and distinct from the May 24, 2014 work-related right shoulder rotator cuff tear and related to a condition that developed over time. What Employer ignores here is that the WCJ specifically found Dr. Rubenstein's testimony not credible, noting that Dr. Rubenstein had examined Claimant on April 19, 2016, acknowledged ongoing disability while simultaneously opining that Claimant did not require further treatment for her work injury, and had not reviewed Claimant's June 14, 2017 MRI or the August 11, 2017 reverse shoulder replacement surgery. Thus, Dr. Rubenstein's testimony, which was rejected as not credible, cannot be used to support Employer's position that Claimant had reached maximum

21

medical improvement from her work-related injury prior to her reverse shoulder replacement surgery, such that the work-related injury did not necessitate the 2017 surgery. For these reasons, we cannot conclude that the WCJ committed an error of law by reinstating Claimant's total disability benefits as of November 9, 2016.

Lastly, we address Employer's argument that the Board committed an error of law by substituting its own judgment for that of the WCJ and modifying the WCJ's order to award Claimant indemnity benefits for total disability from November 9, 2016, and ongoing thereafter. More specifically, Employer argues that the WCJ and the Board relieved Claimant of her burden of proving the duration and extent of her disability and improperly imposed the burden of proving Claimant's ability to perform work onto Employer after reinstating Claimant's total disability benefits for a non-work-related shoulder replacement. In response, Claimant argues that the Board properly clarified the WCJ's order to avoid any misinterpretation of the language "through the present" because, in the context of an award of disability benefits, "through the present" means the same as "ongoing."

We simply are not persuaded by Employer's argument that the Board somehow substituted its own judgment for that of the WCJ by modifying the WCJ's order to award Claimant indemnity benefits for total disability from November 9, 2016, and "ongoing" rather than "through the present." The Board modified the WCJ's order simply to correct language that could be subject to misinterpretation. In addition, the WCJ did not make any findings of fact or conclusions of law that would suggest that he intended for Claimant's workers' compensation benefits to be modified, suspended, or terminated as of the date of his decision. For these reasons, we cannot conclude that the Board committed an error

22

of law by modifying the WCJ's order to award Claimant indemnity benefits for total disability from November 9, 2016, and ongoing thereafter.

Accordingly, we affirm the Board's order.

P. KEVIN BROBSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

P&A Marketing and Allegheny     :
Point Insurance,     :
                 Petitioners     :
    :
           v.     :    No. 1588 C.D. 2018
    :
Workers' Compensation Appeal     :
Board (Spencer),     :
                 Respondent     :

## **O R D E R**

AND NOW, this 12th day of August, 2019, the order of the Workers' Compensation Appeal Board is hereby AFFIRMED.

_____
P. KEVIN BROBSON, Judge